UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
                                                    :

GEORGE PAUL SALEMO,

                                                    :

                 Petitioner,                    REPORT AND

                                               :          RECOMMENDATION

           -v.-

                                             :          14 Civ.1868 (JSR)(GWG)

UNITED STATES OF AMERICA,          11 Cr. 65 (JSR)

                                           :

               Respondent.

                                           :
------------------------------------------------------------------------x

**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

Plaintiff George Salemo brings this pro se petition for a writ of habeas corpus pursuant to

28 U.S.C. § 2255 following his conviction on two counts of wire fraud in violation of 18 U.S.C.

§ 1343 on July 7, 2011.  Salemo was sentenced principally to 162 months imprisonment and is

currently serving that sentence.  For the reasons stated below, Salemo's petition should be

denied.

I.       BACKGROUND

       A.      Indictment and Pre-Trial Appearances

Salemo was indicted in the Southern District of New York on two counts of wire fraud in

violation of 18 U.S.C. § 1343.  See Indictment, United States v. Salemo, 11 Cr. 65 (JSR), filed

Jan. 19, 2011 (Docket # 6).  The first count of the indictment alleged that, in an effort to obtain

funds from various financial lending institutions, Salemo caused a fraudulent document

purporting to be a United States Department of Agriculture ("USDA") grant agreement to be

transmitted by email.  See id. ¶ 1.  The second count alleged that Salemo transmitted, through

email and fax, an altered check and a check drawn on a closed bank account, for the purpose of

obtaining real property fraudulently.  See id. ¶ 2.

Priya Chaudhry was initially appointed as Salemo's CJA attorney, and she represented him at his initial appearance and arraignment.  On March 14, 2011, Michael Schachter of Willkie Farr & Gallagher LLP was substituted in as Salemo's counsel.  Schachter and his firm represented Salemo at trial and sentencing and on direct appeal.  See Ex. A to Memorandum of Law of the United States of America in Opposition to the Motion of George Salemo under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct His Sentence, filed July 1, 2014 (Docket # 6) ("Gov't Mem.") (transcript of trial) ("Tr."); Ex. C to Gov't Mem. (transcript of sentencing hearing) ("Sent. Tr."); United States v. Salemo, 499 F. App'x 110, 112 (2d Cir. 2012) (Summary Order).

B.    Trial

Judge Jed S. Rakoff presided over Salemo's trial, which began on June 28, 2011, and ended on July 5, 2011.  (See Tr.).  Over the course of the trial, the Government presented ten witnesses, all of whom were cross-examined by defense counsel.  The defense called no witnesses, although it offered a stipulation and a document into evidence.  (See Tr. 634-35).  The evidence presented at trial is summarized below to the extent relevant to the issues in the petition.

1.    Evidence as to the USDA Grant Scheme

As to the first count of the indictment, the Government offered evidence that, in 2008, Salemo met Erik Hagberg, the founder of a company called Pacific Aquaculture Cooperatives International  ("PAC"), which dealt with sea cucumber development and operated in the Marshall Islands.  (See Hagberg: Tr. 97, 99-100, 106).  Hagberg and Salemo discussed using Salemo's company, the Global Alliance for International Advancement ("GAIA"), to obtain funding for PAC.  (See Hagberg: Tr. 107-08, 116-18, 121; Dalmau: Tr. 374-75).

2

As described further below, Salemo's scheme involved presenting to potential investors a document that purported to be a "Grant Agreement" between the United States Department of Agriculture ("USDA") and GAIA to fund PAC in the amount of $2,250,000.  (See Porsch: Tr. 60; Lucangeli: Tr. 76).[1]  The purported "grant" was to fund the development of sea cucumber farms by PAC.  (Mikkelsen: Tr. 46-47); GX 106.  Two copies of this grant document, bearing the signatures of Salemo and an individual named Steven Mikkelsen, were offered into evidence. (Mikkelsen: Tr. 41-54).  Mikkelsen, who worked for the USDA's Farm Service Agency, testified that his signature on the grant document was a forgery, that he had never signed the grant, and that grants of the nature reflected in the document — for aquaculture — are issued by the USDA only to states, not to private entities such as PAC.  (Mikkelsen: Tr. 36, 39-42, 45-52).

Salemo's company, GAIA, was listed on the grant agreement as the "fiscal sponsor" of PAC.  (Mikkelsen: Tr. 47); GX 106.  The Government offered testimony that, as part of his fraud, Salemo placed advertisements in newspapers seeking investments in connection with PAC's business and the forged USDA grant.  (See Porsch: Tr. 58-59).

Hartmut Porsch testified that he met with Salemo and that Salemo had emailed a copy of the forged grant to him as part of Salemo's request for a bridge loan of $1,000,000, in return for which Salemo would assign the right to receive payment from the grant to Porsch.  (See Porsch: Tr. 59-67).  That email was offered into evidence.  (Tr. 60).  Salemo promised Porsch that a

---

[1]  The grant agreement itself was admitted as Government Exhibit 106  ("GX 106") and appears in the appendix that was filed as part of Salemo's appeal.  The Government purported to attach this appendix to its memorandum of law in opposition to the habeas corpus petition, see Gov't Mem. at 5 n.1, but failed to do so.  The appendix is available, however, in the Second Circuit docket.  See Appendix, United States v. Salemo, 11-4631 (2d Cir. filed Mar. 1, 2012) (Docket # 17) ("App. App'x").  GX 106 appears at pages A11-17.

bridge loan investment with GAIA would produce a 25% return once the USDA disbursed the grant funds. (Porsch: Tr. 63). Salemo requested that the investment funds be deposited into GAIA's bank account, which he controlled. (Porsch: Tr. 61; Dinkins: Tr. 569-70). On cross-examination, Porsch acknowledged that he had no knowledge of whether Salemo knew that the grant was a forgery, or whether Salemo forged the grant himself. (Porsch: Tr. 69-70).

Natalio Lucangeli, a managing member of a company called Broadway Capital, testified that Salemo had told Lucangeli he wanted "to sell the proceeds of the grant." (Lucangeli: Tr. 71, 73). Salemo told Lucangeli he needed to find a buyer for the grant because Salemo "needed cash" and that he "wanted [$]750,000." (Lucangeli: Tr. 73-74). A copy of the grant that Lucangeli had received by fax, containing Salemo's signature and the forged signature of Mikkelsen, was submitted into evidence. (See Lucangeli: Tr. 76-77); GX 106. Lucangeli testified that the only person at Salemo's office he discussed the grant with was Salemo himself (Lucangeli: Tr. 80), and that Salemo had offered to introduce Lucangeli to the individual from the USDA who had signed the grant (Lucangeli: Tr. 88, 91). On cross-examination, Lucangeli indicated that he had initially thought the grant was real and that Salemo had said he was positive it would "pass due diligence." (Lucangeli: Tr. 92-93).

Hagberg testified that although GAIA entered into an agreement under which GAIA would work to obtain funding for PAC (see Hagberg: Tr. 107, 120-22), Salemo never told him that he had received a grant with PAC's name on it (Hagberg: Tr. 132). Questioned by defense counsel, Hagberg indicated that he had told Salemo that he believed the USDA grant process would likely result in funding for his aquaculture project at some point (see Hagberg: Tr. 139-40) and that he had previously written an aquaculture grant application to the USDA (Hagberg: Tr. 142).

4

Pedro Dalmau, who had worked for GAIA in various capacities (see Dalmau: Tr. 369, 383), testified that he saw a document that appeared to be a grant from the USDA to PAC when he was examining Salemo's emails (Dalmau: Tr. 380-81). He stated that a signature on the grant purporting to be that of GAIA co-founder, Brandon Williams, did not match Williams's usual signature. (Dalmau: Tr. 368, 381-82).

James Knee, an independent contractor who provided funding for businesses (Knee: Tr. 484) testified that Salemo had asked him to advance approximately $1,000,000 in funding against a USDA grant, which Salemo represented GAIA had already been awarded (Knee: Tr. 487, 490, 497). A copy of the grant in question, which Knee stated he originally saw at Salemo's office, was received into evidence. (Tr. 489). Knee testified that he and GAIA, by Salemo's signature as CEO, entered into an agreement for Knee to locate funding for the advance that Salemo had requested, though he was ultimately unsuccessful. (Knee: Tr. 498-500, 502).

Agent Bethanne Dinkins of the USDA's Office of Inspector General testified that she had received copies of the grant document itself or a similar document from Mikkelsen and several GAIA employees. (Dinkins: Tr. 562, 565-67, 569). Approximately three of those copies bore Salemo's signature, and the others bore the purported signature of Williams. (Dinkins: Tr. 566). The purported grant document stated that funds were to be directed to a bank account that was identified as being held by GAIA. (See Dinkins: Tr. 569-70).

### 2.   Evidence as to the Real Estate Scheme

As to the second count of the indictment, the Government offered evidence that Salemo transmitted copies of fraudulent checks in an attempt to obtain title to seven apartment buildings he had contracted to purchase. Julie Corrado, a residential real estate broker (Corrado: Tr. 157),

5

testified that while Salemo was incarcerated on a separate matter, he had discussed with her his plan to buy the buildings, which were owned by a company called Milbank (see Corrado: Tr. 171, 193).  On Salemo's instruction, Corrado emailed Milbank's representative a "proof of funds" that she had received from Salemo, purportedly showing that Salemo's company, called American Reclaimed Properties, Inc. ("ARP"), had a bank account with a balance of over $50,000,000.  (Corrado: Tr. 212-16).  The "proof of funds" was missing an account number and contained other errors.  (See Corrado: Tr. 214-15).  When Corrado asked Salemo about the missing account number, he responded that it was "to protect the account" and that if Milbank "dug deeper and had any kind of access to the account through an account number, then for some reason it would be putting it in jeopardy."  (Corrado: Tr. 219-20).  In fact, the Government offered evidence that Salemo had altered a bank statement for an account held by an individual named Gabriel Gatto to make it appear as though ARP had these funds available to it when it did not.  See Dinkins: Tr. 590-91; Government Exhibit 317R, annexed in App. App'x at A30.

Corrado testified that Salemo directed her to execute a purchase contract for the properties.  (See Corrado: Tr. 224-26).  At Salemo's direction, Corrado signed Salemo's name to a contract between ARP and Milbank to purchase the properties.  (See Corrado: Tr. 193, 224-28); see also Government Exhibit 402, annexed in App. App'x at A31-A101 ("GX 402") (copy of this contract).  That contract provided that the purchase price of the properties was $22,000,000, and that Milbank was to receive a deposit of $5,000,000.  (Corrado: Tr. 227); GX 402 §§ 2.2.1, 2.2.2(a).  Eventually, Salemo wrote a check for $5,000,000 from an account held by the company that he and Corrado were using to complete the transaction.  (See Corrado: Tr. 197-98, 250, 254-56).  Salemo did so despite the fact that he knew from Corrado that the account

balance was only "somewhere around $10,000 to $12,000" at about the time the check was written. (Corrado: 256-57, 261).

On cross-examination, defense counsel questioned Corrado as to whether she herself had blacked out the account number on the bank statement. (Corrado: Tr. 312-14). When she stated that she had not, the defense attempted (unsuccessfully) to have admitted into evidence a document to impeach Corrado. (See Corrado: Tr. 314-15). In response to defense counsel's questions about the $5,000,000 down payment required by the contract for purchase of the properties, Corrado acknowledged that the contract stated that the payment must be deposited by bank wire and did not say that the down payment could be made via a faxed photocopy of a check. (Corrado: Tr. 345-46).

Rodney Yashouafar, a project manager at Milbank, testified that he had seen the fraudulent bank statement and had also received a copy of a check from ARP for $5,000,000, which was signed by Salemo, dated October 8, 2010, and made out to an individual named Seymour Hurwitz.[2] (Yashouafar: Tr. 388-89, 397, 406, 417-18). According to Yashouafar, Salemo had hired Hurwitz "as an escrow agent and attorney to draft the contract" with Milbank to purchase the properties. (Yashouafar: Tr. 447). Salemo's counsel argued that the copy of the check that Yashouafar had referenced was not admissible, and voir dire was conducted on this point. (See Tr. 409-17). The objection was ultimately overruled and the copy of the check was admitted. (See Tr. 417).

Yashouafar testified that there were certain inconsistencies on the face of the check (Yashouafar: Tr. 419-20). He also testified that he had received a second check by fax for

---

[2] This individual is also referred to by the name "Horowitz" in the trial transcript (see Corrado: Tr. 251, 254; Yashouafar: Tr. 417, 422, 432-36, 442, 447-49).

$5,000,000 from ARP, made out to Milbank's in-house counsel, dated October 12, 2010.

(Yashouafar: Tr. 422-24).  That second check also appeared to be invalid, and when Yashouafar

asked Salemo about this, Salemo responded that "the check is good" or "the check is okay."

(Yashouafar: Tr. 426-27).  A copy of that check was admitted into evidence.  (Tr. 423;

Government Exhibit 405, annexed in App. App'x at A119 ("GX 405")).  Yashouafar testified

that he had received by email a copy of a third check for $5,000,000, signed by Corrado and

dated October 28, 2010, which Salemo had given to Hurwitz and which Hurwitz forwarded to

Milbank.  (See Yashouafar: Tr. 435-36, 447-49).  A redacted copy of that email also was

admitted into evidence.  (Tr. 436, 446; Government Exhibit 410, annexed in App. App'x at

A126-28).  On cross-examination, Yashouafar stated that Milbank never actually received the

$5,000,000 deposit, but only a fax, photocopy, or printout of checks for that amount.

(Yashouafar: Tr. 459-60, 463).  Nonetheless, in e-mails to Yashouafar, Salemo apparently urged

Milbank to accept the check copies as proof of the $5,000,000 deposit and to go forward with the

sale of the properties.  (See Tr. 430-435; Government Exhibit 500A, annexed in App. App'x at

A103-14).  Yashouafar confirmed that the $5,000,000 deposit was to be made by bank wire, not

by check (Yashouafar: Tr. 453-54), and that Milbank did not and would not have turned over the

deeds to the properties without receiving the full $22,000,000 purchase price (Yashouafar: Tr.

452-53, 463-64).

Ramak Radparvar, who had worked as a construction supervisor and assistant property

supervisor in charge of several Milbank properties in New York City (Radparvar: Tr. 507-08),

testified that Salemo, identifying himself as Gerald Meyers, had gone with him on a walk-

through of a number of the apartment buildings as a potential buyer (Radparvar: Tr. 510-12, 514-

15).  He testified that Milbank's corporate office had forwarded him by email a copy of the

check dated October 12, 2010, from ARP (Radparvar: Tr. 522, see Tr. 423), and that he had

unsuccessfully tried to verify the address of ARP listed on the check (Radparvar: Tr. 523-26).

Radparvar also testified that he had been forwarded an email that was sent to Milbank containing

a copy of the second check issued to Hurwitz.  (See Radparvar: Tr. 613).  That email was

admitted into evidence.  (Tr. 614).  He stated he had been unable to verify the address of

Fordham Group Properties, the business listed on this check and that the listed address was a

P.O. box.  (Radparvar: Tr. 614-16).  On cross-examination, Radparvar acknowledged that

Milbank was anxious to sell the buildings it had for sale and that he had met with Salemo several

times at length.  (Radparvar: Tr. 631-32).

Agent Dinkins testified that she obtained a search warrant that allowed her to look at a

box of materials from the GAIA office.  (Dinkins: Tr. 596).  Included in these materials were

two payroll checks signed by Salemo, which were admitted into evidence without objection.

(Dinkins: Tr. 595-96, 603, 605).  Those two payroll checks contained identical check and

account numbers as two of the check copies sent to Milbank.  (See Dinkins: Tr. 603-07).

The Government also questioned Dinkins about the Gatto bank account statement, which

Dinkins testified she discovered in a briefcase that was seized incident to Salemo's arrest.

(Dinkins: Tr. 590).  That bank statement showed a balance that was identical, except for the first

digit, to the balance on the statement of the account purportedly belonging to ARP, which was

the statement Corrado had emailed to Milbank as a "proof of funds" on Salemo's instruction.

(See Dinkins: Tr. 591-92; Corrado: Tr. 212-16).  The Gatto statement was admitted into

evidence without objection.  (Tr. 590.)

After the close of the Government's case, the defense read a number of documents into

evidence by stipulation, but did not call any witnesses of its own.  (See Tr. 634-35).

Additionally, defense counsel argued that a series of emails between Salemo and Hurwitz should be admitted to show Salemo's state of mind (see Tr. 530-34), but the Court ruled that these emails were not admissible without the testimony of either Salemo or Hurwitz to "explain their context" to the jury (Tr. 535).  Salemo moved for judgment of acquittal on both counts of the indictment on the ground that the Government's evidence was insufficient for a reasonable juror to convict him (Tr. 636), but this motion was denied (Tr. 637-39).

       C.     <u>Deliberation, Verdict, Post-Trial Motion, and Sentencing</u>

During the course of their deliberation, the jury sent several notes asking questions regarding the Court's instructions to the jury.  One of these notes, which was marked as "Jury Note No. 2," asked, "Does a photocopy of a check constitute a 'check' for the purpose of Count 2?" (Tr. 774).  In its argument to the court, the Government contended that the note raised "a pure question of law," which "clearly relates to whether or not altered or otherwise improper checks" in the jury instructions "includes a photocopy of a check."  (Tr. 775, 779).  The jury instruction at issue was one that asked the jury to determine whether Salemo "participated in a scheme to fraudulently obtain real estate property by using altered or otherwise improper checks."  (Tr. 755, 775).  Defense counsel argued that the question might be one of fact, which should be answered not by the Court, but by the jury.  (See Tr. 774-79).  The Court concluded that "[p]articularly the use of the quote around 'check' made it clear [the jury was] referring to the use in the instruction itself, and the only right and simple answer to that question about the use of the word 'check' is the answer yes."  (Tr. 780).  The Court responded to Jury Note No. 2 with its own note, stating that with respect to the question posed, "the answer is yes."  (Id.)  On July 7, 2011, after two days of deliberation, the jury returned a verdict of guilty on both counts of the indictment.  (Tr. 782, 810-12).

On August 4, 2011, Salemo submitted a motion for judgment of acquittal or a new trial, on the grounds that "the government failed to introduce evidence sufficient to prove beyond a reasonable doubt that Mr. Salemo committed the wire fraud offenses charged."  See George P. Salemo's Post-Trial Motion for a Judgment of Acquittal or New Trial, United States v. Salemo, 11 Cr. 65 (JSR), filed Aug. 4, 2011 (Docket # 45); Memorandum of Law in Support of Defendant George P. Salemo's Post-Trial Motion for a Judgment of Acquittal or New Trial, United States v. Salemo, 11 Cr. 65 (JSR), filed Aug. 4, 2011 (Docket # 46).  This motion was effectively denied when the Court entered judgment on the jury's verdict of guilty.  See Judgment in a Criminal Case, United States v. Salemo, 11 Cr. 65 (JSR), dated Oct. 26, 2011, and filed Oct. 27, 2011 (Docket # 49).  Salemo's sentencing hearing was set for October 19, 2011. (Tr. 813).

Prior to Salemo's sentencing, the United States Probation Office prepared a Presentence Investigation Report ("PSR"), which included a proposed calculation of Salemo's sentencing range under the United States Sentencing Guidelines (the "Guidelines").  See Memorandum, United States District Court Southern District of New York Probation Office, annexed as Ex. E. to Gov't Mem, at 6-12.  The PSR calculated Salemo's Base Offense Level as six and his Total Offense level as 28, noting that a 22-level increase was applicable because Salemo intended to fraudulently obtain the properties without paying the $22,000,000 purchase price.  See id. at 6. It stated that Salemo's criminal history placed him within Criminal History Category V.  Id. at 6-12.  The PSR concluded that Salemo's Guidelines sentencing range was 130 to 162 months imprisonment.  Id. at 20.  It recommended a sentence of 130 months imprisonment.  Id. at 20-21.

Also before his sentencing, Salemo's counsel sent a seven-page sentencing letter to the Court.  See Letter addressed to Judge Jed S. Rakoff from Michael S. Schachter, dated Oct. 12,

11

2011, annexed in App. App'x at A256-62 ("Def. Sent. Ltr.").  The letter argued that Salemo's

Offense Level under the Guidelines should have been calculated as 20 because Salemo did not

intend to cause $22,000,000 in losses.  See id. at 2-3, 5.  It also argued that Salemo was entitled

to a reduction in his Criminal History Category because his prior convictions were remote in

time.  See id. at 5.  Finally, the letter requested a sentence reduction based on Salemo's advanced

age and ill health.  See id. at 6.  The Government argued that the Court should impose a sentence

within the Guidelines range.  See Government's Sentencing Memorandum, United States v.

Salemo, 11 Cr. 65 (JSR), filed Oct. 17, 2011 (Docket # 48), at 2, 15.

    At the sentencing, Salemo's counsel made a general objection to the description of the

offense conduct contained in the PSR and argued that one of the sentences for a prior conviction

listed in the PSR was misstated.  (See Sent. Tr. at 2-3).  Other than these objections, defense

counsel relied on its sentencing submission.  (Sent. Tr. 4-6).  In rendering the sentence, the Court

noted the goals of specific and general deterrence and stated that Salemo's case "cries out for

serious punishment, in light of his history and in light of the nature of these offenses."  (Sent. Tr.

10).  The Court considered that the Guidelines were correct in "the proffered magnitude of

sentence" but stated that "the guideline calculation, frankly, plays very little role in this

sentence."  (Id.)  The Court sentenced Salemo principally to 162 months imprisonment.  (Sent.

Tr. 10-11).

    D.    Salemo's Direct Appeal

    Salemo appealed his conviction to the Second Circuit.  On appeal, he argued (1) that the

Government had not provided sufficient evidence to support his conviction on the second count

of the indictment; (2) that the district court erred in its answer to a note from the jury asking

whether the use of deceitful means to stall constitutes a scheme to defraud; (3) that the district

court erred in denying Salemo's motion to sever the two counts; (4) that the district court abused

its discretion in refusing to admit into evidence two emails between Salemo and Hurwitz, which

were relevant to Salemo's intent; and (5) that the district court erred in basing Salemo's sentence

on a finding of a loss in the amount of $22,000,000 as to the second count.  See Brief for

Defendant-Appellant, United States v. Salemo, 11-4631 (2d Cir. filed Mar. 1, 2012) (Docket

# 16) ("Salemo App. Br.").  In a Summary Order entered October 10, 2012, the Second Circuit

rejected each of these arguments and affirmed Salemo's conviction and sentence.  See United

States v. Salemo, 499 F. App'x 110 (2d Cir. 2012).

      E.     The Instant Habeas Petition

Salemo filed the instant motion to vacate, set aside, or correct his sentence pursuant to 28

U.S.C. § 2255 on March 10, 2014 (Docket # 1) ("Pet.").  The petition claimed, first, that

Salemo's counsel was ineffective in various respects; second, that the trial court erred in its

response to Jury Note No. 2; and third, that the trial court erred by "sealing the discovery product

of the Government's interview of attorney Seymour Hurwitz."  Id. at 3 (capitalization omitted).

The Government filed opposition papers on July 1, 2014.  See Gov't Mem.  Salemo twice

requested and received extensions of the deadline to submit a response to the Government's

papers, see Endorsed Letter from George Salemo dated Sept. 18, 2014, filed Sept. 29, 2014

(Docket # 11); Memo Endorsement on Letter from George Salemo dated Oct. 28, 2014, filed

Nov. 6, 2014 (Docket # 13), but he never filed any response.

The Court later ordered the Government to provide supplemental briefing addressing

Salemo's claims regarding his counsel's failure to move to suppress evidence that was allegedly

seized illegally.  See Order, filed May 6, 2015 (Docket # 14).  The Government filed a letter on

June 14, 2015 (Docket # 19) ("Gov't Supp'l Resp."), and Salemo submitted a response, see

Response to the Government's Reply to the [sic], filed Aug. 12, 2015 (Docket # 23) ("Salemo

Supp'l Reply").  By Order dated August 18, 2015 (Docket # 24), the Court required the

Government to submit another supplemental brief addressing one of the pieces of evidence that

Salemo contends was seized illegally, which the Government did on August 24, 2015 (Docket

# 25) ("Gov't Second Supp'l Resp.").  Salemo submitted a response on September 2, 2015

(Docket # 26) ("Salemo Second Supp'l Reply").

On September 16, 2015, the Court requested a submission from Salemo's defense

counsel in the underlying criminal action, Michael Schachter, that would address the reasons

certain witnesses were not interviewed or, if interviewed, the reasons why they were not called

as witnesses.  See Order, filed Sept. 16, 2015 (Docket # 27).[3]  Mr. Schachter then filed an

affidavit pursuant to the Court's Order, Affidavit of Michael Schachter, filed Dec. 11, 2015

(Docket # 32) ("Schachter Aff."), and Salemo filed a response, Defendant's Response to the

Affidavit of Attorney Michael Schachter, filed Jan. 28, 2016 (Docket # 35) ("Response to

---

[3]  The Order sought such information with regard to Seymour Hurwitz, Christopher Barnes, Jack Elman, Marcelo Bravo, and Kenneth Barnes.  Id.  Salemo then submitted a letter indicating that the list of potential witnesses described in the Court's Order was incomplete, and provided a list of witnesses whom Salemo believed should have been called.  See Letter to Judge Gabriel W. Gorenstein from George Salemo, filed Oct. 2, 2015 (Docket # 28).  Salemo's letter added the following witnesses: Mike Waring, Ron Redding, Leonardo Gate, Ms. Menutole, Bryie Alison, Keith Baumwald, Wayne Deas, the attorneys at the Goldstein Law Firm, Brandon Williams, and Key Bank officers.  See id.  On October 7, 2015, the court endorsed Salemo's letter and "request[ed] that Mr. Schachter address these additional witnesses in his response to the Court's Order dated September 11, 2015."  See Memo Endorsement, filed Oct. 7, 2015 (Docket # 29).

Schachter Aff.").[4]

II.     APPLICABLE LAW

   A.     Law Governing Petitions Under 28 U.S.C. § 2255

   Section 2255(a) of Title 28 of the United States Code provides that

   [a] prisoner in custody under sentence of a court established by Act of Congress
   claiming the right to be released upon the ground that the sentence was imposed
   in violation of the Constitution or laws of the United States, or that the court was
   without jurisdiction to impose such sentence, or that the sentence was in excess of
   the maximum authorized by law, or is otherwise subject to collateral attack, may
   move the court which imposed the sentence to vacate, set aside or correct the
   sentence.

Relief under this statute is available "only for a constitutional error, a lack of jurisdiction in the

sentencing court, or an error of law or fact that constitutes a fundamental defect which inherently

results in [a] complete miscarriage of justice."  Graziano v. United States, 83 F.3d 587, 590 (2d

Cir. 1996) (per curiam) (citation and internal quotation marks omitted).  "Because collateral

challenges are in tension with society's strong interest in the finality of criminal convictions, the

courts have established rules that make it more difficult for a defendant to upset a conviction by

collateral, as opposed to direct, attack."  Yick Man Mui v. United States, 614 F.3d 50, 53 (2d

Cir. 2010) (citation and internal quotation marks omitted).  A live testimonial hearing is required

to adjudicate a § 2255 motion only in circumstances not present here.  See Puglisi v. United

States, 586 F.3d 209, 213 (2d Cir. 2009) ("[I]f it plainly appears from the motion, any attached

exhibits, and the record of prior proceedings that the moving party is not entitled to relief, the

judge must dismiss the motion.") (alteration, citations, and internal quotation marks omitted);

Chang v. United States, 250 F.3d 79, 86 (2d Cir. 2001) (district court's review of the papers

---

   [4] Citations to specific pages in this document refer to the ECF-assigned pagination.

submitted with respect to the petition constituted a sufficient evidentiary hearing).[5]

      B.      <u>Law Governing Procedural Default</u>

If a claim contained in a habeas petition was not asserted on direct review, the claim will be considered procedurally defaulted — and thus ineligible for review in a subsequent proceeding under § 2255 — unless the petitioner "can first demonstrate either 'cause' [for the default] and actual 'prejudice' . . . or that he is 'actually innocent.'"  <u>Bousley v. United States</u>, 523 U.S. 614, 622 (1998) (citations omitted); <u>accord</u> <u>United States v. Frady</u>, 456 U.S. 152, 167-68 (1982); <u>Zhang v. United States</u>, 506 F.3d 162, 166 (2d Cir. 2007).  To satisfy the "cause" requirement, the petitioner must show circumstances "'<u>external</u> to the petitioner, something that cannot be fairly attributed to him.'"  <u>Marone v. United States</u>, 10 F.3d 65, 67 (2d Cir. 1993) (per curiam) (quoting <u>Coleman v. Thompson</u>, 501 U.S. 722, 753 (1991), <u>superseded in part by</u> 28 U.S.C. § 2255(b)(2)) (emphasis in original).  "Objective factors that constitute cause include interference by officials that makes compliance with the State's procedural rule impracticable, and a showing that the factual or legal basis for a claim was not reasonably available to counsel."  <u>McCleskey v. Zant</u>, 499 U.S. 467, 493-94 (1991) (citation and internal quotation marks omitted).  Attorney error or ignorance does not amount to "cause" for a procedural default unless the error rises to the level of constitutional ineffectiveness.  <u>See</u> <u>Coleman</u>, 501 U.S. at 752-54.  The resulting "prejudice" must create an "<u>actual</u> and substantial disadvantage, infecting [the petitioner's] entire trial with error of constitutional dimensions."  <u>Frady</u>, 456 U.S. at 170 (emphasis in original).  Finally, "[t]o establish actual innocence, [the] petitioner must

---

    [5]  There is a one-year time limit for habeas petitions filed under § 2255.  <u>See</u> 28 U.S.C. § 2255(f).  While it seems that the petition is untimely, the Court does not address this issue inasmuch as the Government has not raised it.

demonstrate that, in light of all the evidence, it is more likely than not that no reasonable juror would have convicted him." Bousley, 523 U.S. at 623 (citations and internal quotation marks omitted).

An exception to the procedural default rule exists for claims of ineffective assistance of counsel. In Massaro v. United States, 538 U.S. 500 (2003), the Supreme Court held that "an ineffective-assistance-of-counsel claim may be brought in a collateral proceeding under § 2255, whether or not the petitioner could have raised the claim on direct appeal." Id. at 504.

C.    Law Governing Ineffective Assistance of Counsel Claims

To prove ineffective assistance, a petitioner must show (1) "that counsel's representation fell below an objective standard of reasonableness"; and (2) "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland v. Washington, 466 U.S. 668, 688, 694 (1984)); accord United States v. Brown, 623 F.3d 104, 112 (2d Cir. 2010); Pham, 317 F.3d 178, 182 (2d Cir. 2003); see also Massaro, 538 U.S. at 505 ("[A] defendant claiming ineffective counsel must show that counsel's actions were not supported by a reasonable strategy and that the error was prejudicial.").

In evaluating the first prong — whether counsel's performance fell below an objective standard of reasonableness — "'[j]udicial scrutiny . . . must be highly deferential,'" and the petitioner must overcome the "'presumption that, under the circumstances, the challenged action might be considered sound trial strategy.'" Bell v. Cone, 535 U.S. 685, 698 (2002) (quoting Strickland, 466 U.S. at 689) (alteration in original); see Dunham v. Travis, 313 F.3d 724, 730 (2d Cir. 2002) (according counsel a presumption of competence). With respect to the second prong — the prejudice requirement — the petitioner "must show that there is a reasonable

17

probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694; accord Lynn v. Bliden, 443 F.3d 238, 247-48 (2d Cir. 2006).  The Second Circuit generally "requires some objective evidence other than defendant's assertions to establish prejudice." Pham, 317 F.3d at 182 (citing United States v. Gordon, 156 F.3d 376, 380-81 (2d Cir. 1998) (per curiam)).  Unlike the reasonableness prong, the prejudice determination "may be made with the benefit of hindsight." Morgan v. United States, 2009 WL 1172849, at *5 (E.D.N.Y. May 1, 2009) (citing Lockhart v. Fretwell, 506 U.S. 364, 371-73 (1993)).

III.   DISCUSSION

As a preliminary matter, the Court notes that because Salemo is a pro se litigant, we hold his submissions "to less stringent standards than formal pleadings drafted by lawyers." Hughes v. Rowe, 449 U.S. 5, 9 (1980) (per curiam) (citations omitted); accord Scales v. N.Y. State Div. of Parole, 396 F. Supp. 2d 423, 428 (S.D.N.Y. 2005).  Additionally, we construe his submissions "liberally." E.g., McPherson v. Coombe, 174 F.3d 276, 280 (2d Cir. 1999).

We discuss in turn Salemo's claims (1) that the district court made certain errors at trial, and (2) that he was denied the effective assistance of counsel at trial and sentencing.  See Pet. at 3.

A.   Salemo's Claims of Errors by the Trial Court

In his petition, Salemo claims that the district court made two errors in the course of his trial.  First, he argues that the Court's response to the question posed in Jury Note No. 2 — answering "yes" to the question "[d]oes a photocopy of a check constitute a 'check' for the

18

purpose of Count 2?" (Tr. 774, 780) — was in error.  See Pet. at 3, 51-52.  Second, he claims

that the Court "improperly sealed the Government's discovery product of Attorney Seymour

Hurwitz."  Id. at 52-53 (capitalization omitted).  While it is not clear what Salemo refers to here,

we presume it relates to Salemo's pre-trial motion to compel the Government to produce "all

notes and interview memoranda of interviews with Mr. Hurwitz."  See Notice of Motion to

Compel, United States v. Salemo, 11 Cr. 65 (JSR), filed June 17, 2011 (Docket # 24);

Memorandum of Law in Support of George P. Salemo's Motion to Compel the Government to

Produce Materials Relating to Seymour Hurwitz, United States v. Salemo, 11 Cr. 65 (JSR), filed

June 17, 2011 (Docket # 25), at 1.  The Government argues that these claims of judicial error are

both procedurally defaulted and without merit.  See Gov't Mem. at 17-19.[6]

As the Second Circuit has noted, "[a] § 2255 petition may not be used as a substitute for

a direct appeal."  Marone, 10 F.3d at 67 (citing Frady, 456 U.S. at 165).  Here, Salemo did not

raise either of these claims of judicial error on direct appeal.  See generally Salemo App. Br.;

Summary Order, United States v. Salemo, 499 F. App'x 110 (2d Cir. 2012).  Moreover, he has

provided no explanation for that failure, let alone established "good cause" in the form of an

"external" force "that cannot be fairly attributed to him."  Marone, 10 F.3d at 67 (emphasis,

quotation marks, and citation omitted).  Nor has he shown that he is "actually innocent" of the

crimes of which he was convicted.  To show "actual innocence," Salemo would need to "support

his allegations of constitutional error with new reliable evidence."  Schlup v. Delo, 513 U.S. 298,

324 (1995).  Salemo, however, offers no new evidence to support his allegations.  For these

reasons, we conclude that these claims are procedurally defaulted and that Salemo is barred from

---

[6]  Citations to specific pages in this memorandum refer to the ECF-assigned pagination.

raising them here.

B.   Salemo's Claims of Ineffective Assistance of Counsel

Though the petition is not clear, Salemo seems to make three arguments to support his ineffective assistance of counsel claim.  First, he argues that his counsel failed to present a defense at trial, even though a viable defense was "readily available."  Pet. at 6.  Second, Salemo argues that his counsel erred by not making a motion to suppress certain evidence at trial, despite his request that they do so.  See id. at 9-10.  Finally, he contends that his counsel was ineffective because they did not make an argument at his sentencing hearing.  See id. at 8-9.[7]  We address each of these claims in turn.

1.   Failure to Present a Defense

a.   Deficient Performance

Salemo's main complaint seems to be that his counsel called no witnesses at trial.  See Pet. at 6, 8.  He complains that his counsel did not call Hurwitz, see id. at 8, 49, Christopher Barnes, see id. at 44, Jack Elman, see id. at 45, Probation Officer Marcelo Bravo, see Salemo Second Supp'l Reply at 3, 5-6, or Kenneth Barnes, see id. at 7, to testify.  He also complains that counsel did not call a number of law enforcement agents, GAIA employees, attorneys, and

---

[7]  In addition to these arguments, Salemo refers generally to the limited experience in criminal law of some of his attorneys.  See Pet. at 6.  However, Salemo admits that his lead attorney, Schachter, "is an experienced federal criminal lawyer."  Id.  While Salemo claims that Schachter's "involvement was peripheral," id., the trial transcript shows that Schachter cross-examined multiple witnesses, made objections and applications to the Court, and presented the defense's closing argument.  (See, e.g., Tr. 136-56, 262-306, 310-58, 414-17, 442-44, 450-78, 559-60, 581, 611-12, 619-32, 695-732).  Even if some of Salemo's attorneys were inexperienced in criminal law, that alone would not support an ineffective assistance of counsel claim.  See, e.g., United States v. Salameh, 54 F. Supp. 2d 236, 250 (S.D.N.Y. 1999) (such an argument "would have one conclude that every 'first' trial is perpetrated by an incompetent"), aff'd, 16 F. App'x 73 (2d Cir. 2001).

others who "would confirm all of the facts" surrounding his claims of innocence and the illegal

nature of the criminal investigation overall, Pet. at 28-30.

Several of the individuals identified by Salemo, however — Knee, Dalmau, and

Lucangeli — were called as witnesses at trial by the prosecution and cross-examined by defense

counsel.  Thus we do not consider them further.  As to the other individuals, "[t]he decision

whether to call any witnesses on behalf of the defendant, and if so which witnesses to call, is a

tactical decision of the sort engaged in by defense attorneys in almost every trial."  United States

v. Smith, 198 F.3d 377, 386 (2d Cir. 1999) (quoting United States v. Eisen, 974 F.2d 246, 265

(2d Cir. 1992)) (quotation marks omitted).  To challenge such a tactical decision, it is Salemo's

burden to show that his counsel's actions were "not supported by a reasonable [trial] strategy."

Massaro, 538 U.S. at 505; see also United States v. Luciano, 158 F.3d 655, 660 (2d Cir. 1998)

(per curiam) ("The decision not to call a particular witness is typically a question of trial strategy

that [reviewing] courts are ill-suited to second-guess.") (citations omitted).  Importantly, the

Second Circuit has held that "[c]ounsel's decision as to whether to call specific witnesses —

even ones that might offer exculpatory evidence — is ordinarily not viewed as a lapse in

professional representation."  United States v. Best, 219 F.3d 192, 201 (2d Cir. 2000) (citation

and internal quotation marks omitted).

Additionally, where a petitioner claims that counsel improperly failed to call a witness at

trial, the petitioner must explain what testimony the witness would have offered at trial and why

that testimony would have led to a different outcome.  See, e.g., Ozsusamalar v. United States,

2012 WL 4473286, at *5 (S.D.N.Y. Sept. 28, 2012) (rejecting claim that counsel was ineffective

for failure to investigate or interview a potential witness, because the petitioner "failed to

introduce any evidence that [the witness] would have testified and, if he did, whether he would have provided any exculpatory or impeachment testimony."); <u>Carr v. Senkowski</u>, 2007 WL 3124624, at *21 (W.D.N.Y. Oct. 23, 2007) ("[A] petitioner does not show that he was prejudiced by trial counsel's alleged deficient performance merely by asserting that certain witnesses <u>might</u> have supplied relevant testimony; rather, he must state exactly what testimony they would have supplied and how such testimony would have changed the result.") (emphasis in original); <u>Carneglia v. United States</u>, 2006 WL 148908, at *4 (E.D.N.Y. Jan. 18, 2006) (rejecting challenge based on failure to call defense witnesses where "petitioner has not provided affidavits from the potential witnesses nor any assurance that they would have appeared at trial had counsel interviewed them."); <u>Charles v. United States</u>, 2006 WL 208838, at *4 n.5 (N.D.N.Y. Jan. 19, 2006) ("Conspicuously absent from this allegation is any showing of what testimony the witnesses . . . would have offered in Petitioner's defense, or how this testimony would have led to a different trial result.").

As we explain next, Salemo's claims rest purely on speculation, which often is directly contradicted by other evidence in the record. We group the witnesses according to the subject area of their purported testimony.

i. <u>Witnesses Connected to Count One</u>. Salemo contends that his counsel should have called Brandon Williams, Wayne Deas, and the attorneys of the Goldstein Hall Law Firm to support his defense against the alleged USDA Grant scheme. <u>See</u> Response to Schachter Aff. at 2-3. He argues that, unbeknownst to him, the GAIA executive staff conspired to forge the USDA grant, which he believed was legitimate at the time. Pet. at 8, 15. In support of this alleged conspiracy, Salemo asserts that the testimony of Williams, Deas, and the Goldstein Hall

attorneys would establish Williams's previous knowledge of the grant; show Williams's participation in creating the grant, see Pet. at 30; show that Williams sent the grant to Goldstein Hall; and support that contention that Salemo harbored a "belief that the [g]rant was valid," Response to Schachter Aff. at 2-3.  Salemo also suggests that Goldstein Hall, who had been hired to review the grant's legitimacy, "never questioned the validity of the [g]rant," which, he suggests, supports his argument that he believed the grant was valid.  Id. at 3.  Finally, Salemo argues that Deas should have been called, because a separate witness, Natalio Lucangeli, testified that he had received a copy of the forged grant from Deas, not Salemo.  Pet. at 28.

As discussed in Michael Schachter's affidavit, however, these beliefs are not supported by any evidence in the record and defense counsel's decision not to call these witnesses was entirely reasonable.  Schachter Aff. ¶¶ 5-8.  First, Salemo's argument that attorneys from Goldstein Hall never questioned the validity of the USDA Grant, and only withdrew due to a payment issue, see Response to Schachter Aff. at 3, is inconsistent with the statements of Matthew Hall, an attorney from Goldstein Hall who was involved with Salemo's representation. Prior to trial, Salemo's defense team interviewed Hall, who "informed [them] that Goldstein Hall terminated representation of Mr. Salemo . . . because 'things didn't smell right.'"  Schachter Aff. ¶ 8.  Hall also informed defense counsel that Salemo, not Williams, had provided Goldstein Hall with a copy of the forged USDA grant.  Id.

Next, Salemo's recollection of Lucangeli's testimony and the potential relevance of Deas's testimony is similarly unsupported.  Not only does Lucangeli's testimony never mention Deas, he made clear that Salemo provided him with a copy of the forged USDA grant.  (See Lucangeli: Tr. 92).  Finally, with regard to both Williams and Deas, defense counsel obtained

23

background reports from a private investigator and believes they attempted to contact both individuals, but were ultimately unsuccessful. Schachter Aff. ¶ 6. In light of the above, defense counsel made a reasonable tactical decision not to call these witnesses on Salemo's behalf. If anything, testimony from Goldstein Hall would have further inculpated Salemo. Furthermore, the unknown and speculative benefit the testimony of Williams and Deas could have provided was well outweighed by the significant risk of more harmful testimony. Accordingly, the decision not to call Williams, Deas, or the Goldstein Hall attorneys, was "supported by a reasonable [trial] strategy," Massaro, 538 U.S. at 505, and thus not a "lapse in professional representation," Best, 219 F.3d at 201 (citation and quotation marks omitted).

ii. <u>Witnesses Connected to Count Two</u>. Salemo also argues that Seymour Hurwitz, Christopher Barnes, Kenneth Barnes, Jack Elman, and employees from Key Bank should have been called in connection with the real estate scheme allegation. According to Salemo, Hurwitz's testimony was essential to his defense, as it would have allowed for the admission of three emails between Hurwitz and Salemo concerning payments associated with the real estate purchase. <u>See</u> Response to Schachter Aff. at 4; Pet. at 49. The emails contain questions from Salemo to Hurwitz regarding the correct party to address a deposit check, as well as instructions from Hurwitz to Salemo concerning the upcoming steps of the real estate transaction. <u>See</u> Pet. at 49;[8] Schachter Aff. ¶ 10. Salemo argues that Hurwitz's testimony, and the associated emails, would have "present[ed] a factual picture of a company going through the necessary steps to buy the properties, not steal them," Pet. at 49, and should have been presented to the jury.

---

[8] Salemo contends that the third email was a message from Salemo to Hurwitz, which included the following statement: "[t]he check was faxed at 9:55 am to Homan for the Bronx properties." Pet. at 49.

Defense counsel chose not to call Hurwitz as a witness, and thus was precluded from introducing the three emails into evidence.  As discussed in his affidavit, however, counsel decided against calling Hurwitz, because "Judge Rakoff had denied our pre-trial motion to compel the Government to disclose all materials related to Mr. Hurwitz."  Schachter Aff. ¶ 10. These materials included interview notes and memoranda, as well as documents provided to the Government by Hurwitz.  Id.  Additionally, the emails were essentially innocuous – showing only Salemo's use of Hurwitz as his agent to transmit the payment.  Id.  After concluding that the emails would provide minimal, if any, support for Salemo's claim that he lacked fraudulent intent, defense counsel determined that the risk of unknown and harmful testimony was too high to call him as a witness.  See id.  We agree that this decision was a reasonable one.  There is no reason to believe that the emails or testimony from Hurwitz would have helped Salemo dispute the central allegation against him: that he had presented a forged check to Milbank.

Salemo argues that Jack Elman should also have been called, because Elman, along with Salemo, was involved in the inspection of the real estate properties and because Elman had discussions with both Christopher Barnes and Key Bank officials regarding the real estate transaction.  Pet. at 45-46.  According to Salemo, Elman had also received the fraudulent proof of funds from Julie Corrado and was one of the first people to hear Christopher Barnes and Corrado begin using the fictitious name "Gerald Meyers."  Response to Schachter Aff. at 4. Defense counsel, however, states that in their own interviews with Elman, Elman provided only harmful information regarding Salemo's case.  Specifically, Elman informed defense counsel that "he was initially introduced to Mr. Salemo as 'Gerald Meyers'" and that he had "received several fraudulent checks from Mr. Salemo."  Schachter Aff. ¶ 11.

25

Salemo suggests that "Key Bank [was] important to the defense," Response to Schachter Aff. at 4, as it "approved the buildings," as part of the real estate purchase, and that its "final committee required just a few additional documents" to finalize the transaction, Pet. at 46.  He further states that Key Bank had informed him that "a 15 year, 4% loan was available" and only required "some more info."  Response to Schachter Aff. at 4.  Testimony of this nature, Salemo contends, would have "in itself present[ed] a different picture to the Jury."  Pet. at 46.  Presumably, Salemo thinks such evidence would show that Salemo and his company were attempting to purchase the properties through legal means.  Once again, however, the fact that there was actual real estate involved and that there were entities who took Salmo seriously does nothing to show that Salemo did not himself act fraudulently.  Moreover, defense counsel's own interviews with Key Bank officials did not show that they would have offered helpful evidence.  Defense counsel interviewed Todd Goulet, a Key Bank mortgage broker referred by Salemo.  Schachter Aff. ¶ 12.  Goulet informed them that "Key Bank never received any information from Mr. Salemo necessary to proceed with a financing proposal," and that, due to Salemo's failure to provide necessary information, the bank had not even begun a formal due diligence review.  Id.

Salemo contends that Christopher and Kenneth Barnes should have been called as witnesses to discredit Julie Corrado's testimony, and establish that "Christopher Barnes [was] in charge [of] directing Corrado's every move, authorizing any interaction with [Salemo]," was the mastermind behind the real estate scheme, and used the fictitious name Gerald Meyers.  Pet. 45; Response to Schachter Aff. at 3-4.  He also alleges that Kenneth Barnes's testimony would have shown that Kenneth "controlled . . . [t]he money for [the real estate transaction]," which stemmed from his "proceeds of drug transactions."  Pet. at 47.  Again, these allegations are

barely relevant to the central charge against Salemo:  that he committed fraud in the real estate transaction.  Additionally, there is no evidence that these witnesses would have offered such testimony at trial.  As explained by defense counsel, Corrado testified that she and Salemo planned to purchase the properties using Salemo's own funds.  Schachter Aff. ¶ 13; Corrado: Tr. 183.  The record also indicates that Salemo had sent a fraudulent proof of funds, which suggested he possessed over $58 million, to Corrado, and that she then forwarded that information to Milbank in an attempt to establish Salemo's purchasing power.  (See Corrado: Tr. 211-19).  Finally, defense counsel notes that he chose not to call Christopher Barnes because his relationship with Salemo "could only be explained by disclosure of the pair's joint period of incarceration," something defense counsel had successfully petitioned Judge Rakoff to partially exclude from the jury's knowledge.  See Schachter Aff. ¶ 14.

Accordingly, we find that defense counsel's decision not to call Hurwitz, Elman, the Key Bank officials, Christopher Barnes, and Kenneth Barnes, did not fall below an "objective standard of reasonableness."  Pham, 317 F.3d at 182 (quoting Strickland, 466 U.S. at 688).

iii.  Witnesses Associated with a Pre-Trial Suppression Motion.  Finally, Salemo claims defense counsel was ineffective for not calling Marcelo Bravo, Mike Waring, Leonardo Gale, Ron Redding, Jane Byrie Alison, Keith Baumwald, and Cynthia Menutole.  Response to Schachter Aff. at 6-8; Pet. at 22-23.  Although Salemo's exact rationale is difficult to follow, we interpret his pro se petition to argue that his counsel's failure to call these witnesses was ineffective because they would have provided testimony to support a suppression motion regarding some or all of the incriminating evidence used against Salemo at trial.  Id.

Beyond his own speculation and interpretation of evidence already in the record,

Salemo's only evidence of what testimony these witnesses could have offered is based
exclusively on certain email communications and a "revocation hearing" transcript.  Response to
Schachter Aff. at 8, 10-31.  The email correspondence, however, does not suggest that any of the
searches were illegal or that the named witnesses would provide testimony that it was.  In fact,
the few emails relevant to the seizure of items from Salemo suggest quite the opposite.  See, e.g.,
Response to Schachter Aff. at 11 (Agent Dinkens describes how GAIA employees contacted her
on their own accord and asked her to take possession of "several shopping bags of 'evidence'
which they [believed] might be destroyed by Salemo if it [was] left in the office overnight."); id.
at 17 (Agent Dinkins states that the decision to lock Salemo out of his office was made by the
"interim Chief Executive Officer . . . Troy Sergent").  Not only were most of the emails not
written by any of the named witnesses,[9] they also provide no indication that the witnesses would
have offered helpful testimony.

Similarly, Salemo's transcript evidence fails to provides support for his claim of
ineffective assistance.  Salemo asserts that, based on testimony offered by Denise Morgan — a
witness he sometimes refers to as Denise "Williams," see, e.g., Response to Schachter Aff. at 8
— in another of Salemo's criminal cases, Morgan would have been a favorable witness at trial.
Pet. at 18-19, 24-26; Response to Schachter Aff. at 8.[10]  Salemo asserts that Morgan acted as the

---

[9]  The only email written by one of the named witnesses is a message purportedly sent by
Wayne Deas to Salemo himself.  Response to Schachter Aff. at 16.  The message, however, only
contains the forwarded substance of a separate message, originally sent to Deas from Troy
Sergent, which informed Deas that Salemo was no longer CEO of "the company," which was
"no longer in operation," and that Salemo was currently under federal investigation and on
supervised release.  Id.

[10]  Salemo arguably forfeited any claim that we should examine the failure to call Morgan
as a witness.  On September 16, 2015, the Court issued an order directing defense counsel to
provide an affidavit regarding Salemo's allegations that he had improperly failed to call certain

CFO at GAIA and that because her testimony "contradicts all of Dinkins [sic] statements," his counsel should have interviewed her and called her as a witness before deciding not to file a suppression motion.  See Response to Schachter Aff. at 8; accord Pet. at 18-19, 24-26.  To support this claim, Salemo references Morgan's testimony at his "revocation hearing" before Judge Barbara Jones.  See Response to Schachter Aff. at 8.  Although Salemo's reference to a "revocation hearing" is vague, and he has not provided the Court with a transcript of the testimony, the Court has located and reviewed the transcript of Salemo's August 25, 2009, bail revocation hearing in United States v. Salemo, 09 Cr. 701, held before Judge Barbara S. Jones. See Transcript, dated Aug. 25, 2009 (Docket # 13 in 09 Cr. 701) ("Revocation Transcript") (annexed to Order, dated May 9, 2016 (Docket # 36)); Response to Schachter Aff. at 8 (referencing Denise Williams's testimony at Salemo's revocation hearing before Judge Jones).[11] This transcript provides nothing to support Salemo's argument regarding the legality of the searches performed by the Government.  In fact, Morgan's testimony relates only to the Government's request that Salemo remain detained pending their investigation of the underlying crime upon which the present application is based.  Revocation Transcript at 2-3, 7.  Salemo's

---

witnesses named in the order.  Order, filed Sept. 16, 2015 (Docket # 27).  Salemo then wrote a letter to the Court listing additional witnesses that he asserted should have been included in the Court's September 16 order.  Letter to Judge Gabriel W. Gorenstein from George Salemo, filed Oct. 2, 2015 (Docket # 28).  The Court acceded to Salemo's request by issuing an order directing defense counsel to address the additional witnesses as well.  See Memo Endorsement, filed Oct. 7, 2015 (Docket # 29).  Salemo, however, never mentioned Morgan in his October 2 letter to the Court.  Accordingly, defense counsel did not address her testimony in his own affidavit.

   [11]  At one point, Salemo refers to Morgan's testimony as occurring at his "revocation of supervised release hearing before the Honnorable [sic] Judge Jones SDNY."  Pet. at 18-19.  The court record reflects, however, that Morgan did not testify at the revocation hearing concerning his supervised release.  See Transcript of Oct. 16, 2009 (Docket # 16 in 09 Cr. 701); Transcript of Nov. 4, 2009 (Docket ## 19, 20 in 09 Cr. 701) (annexed to Order dated May 9, 2016 (Docket # 36)).

counsel in that case, Robert Baum, had presented Morgan's testimony to establish that Salemo posed no future "economic danger because he [could no longer] act in any capacity on behalf of [GAIA]." Id. at 7-8. Rather than support Salemo's claim of an unlawful search, Morgan testified that Salemo was asked to resign as CEO because of the investigations associated with the Department of Agriculture Grant. Id. at 18. She testified that "the board was concerned, based on [Salemo's] background and the investigations that were taking place, that it would best be [sic] that he . . . resign." Id. Given the lack of evidence to suggest that Morgan would have helped his case, his claim of ineffective assistance must fail.

iv. Efforts Taken in Support of Salemo's Defense. Notwithstanding defense counsel's decision not to call witnesses on Salemo's behalf, defense counsel took significant steps to advance the defense's theory of the case, expressed during both its opening and closing statements, that the Government could not prove that Salemo knew the USDA grant was a fake and had not proven Salemo actually intended to obtain property in exchange for the fraudulent checks. (See Tr. 9-11; 698-99, 725-26). Defense counsel cross-examined every Government witness — for example, Schachter cross-examined one of the Government's key witnesses, Corrado, at length, questioning her on a wide variety of topics and attempting to impeach her credibility. (See Tr. 261-303, 310-58). Defense counsel offered into evidence various documents to support their theory, see, e.g., Tr. 282-84 (email from Corrado to Radparvar seeking information about the building code violations for the New York City properties), and sought to keep from coming into evidence other documents which might hurt Salemo's case, see, e.g., Tr. 406-17 (defense counsel objecting to the admission of one of the copies of the checks sent to Milbank and conducting voir dire on that point). Indeed, the trial judge was

apparently impressed with the efforts of defense counsel, stating (out of the presence of the jury)
that the defense was "very eloquently stated" and that Salemo should be grateful "that he had
such a good lawyer in this case." (Tr. 791).

Salemo also complains that Schachter, his lead attorney, did not understand commercial
mortgages and therefore did not present certain facts to the jury. See Pet. at 6-7. This is based
on Schachter's statement at a sidebar discussion in which Schachter was attempting to explain to
the Court why emails from Salemo to Corrado about the mortgage process in commercial real
estate were admissible non-hearsay. (See Tr. 291, 293). To that end, Schachter argued that the
defense was offering the email not for the truth of its contents but to show Salemo's state of
mind. (Tr. 293-94). Schachter's full statement on this point was:

> I'm not trying to establish that in fact this is how commercial mortgages work. I
> don't have any idea. I'm sure Mr. Salemo doesn't either. I'm just trying to show
> what he believed was how commercial mortgage applications work to show that
> he is not operating with intent to defraud.

(Tr. 294). Read in context, it is clear that Schachter's comment was made as part of an attempt
to advance the defense's theory of the case. Notwithstanding Salemo's claims to the contrary,
the details of the conduct of commercial mortgages were not an issue in the case. Additionally,
Salemo has not shown that any specific action by Schachter reflected a lack of understanding of
any issue relevant to the case. Thus, Salemo has not shown ineffective assistance of counsel
based on his attorney's alleged failure to present a defense.

### b.   Prejudice

Relatedly, Salemo has not demonstrated the necessary prejudice to succeed on this
ineffective assistance of counsel claim based on his counsel's alleged failure to present a
defense. This alone is reason to find that Salemo is not entitled to habeas relief on this ground.

See, e.g., Strouse v. Leonardo, 928 F.2d 548, 556 (2d Cir. 1991); see also Strickland, 466 U.S. at 697 ("[T]here is no reason for a court deciding an ineffective assistance claim . . . even to address both components of the inquiry if the defendant makes an insufficient showing on one.").

Salemo states that if defense counsel had presented "the defense that was readily available," the trial "would in all probability have resulted in a not guilty verdict" and that "there is a substantial likelihood of a different result" but for his counsel's alleged errors.  Pet. at 6, 50-51; see also Salemo Second Supp'l Reply at 2 ("[H]ad all the necessary witness[es] been ut[i]lized ther[e] would have been no doubt as to the origin of [the] forged grant."  However, he offers no explanation of how any particular complaint regarding his attorney's actions resulted in prejudice.  Absent any "objective evidence [of prejudice] other than defendant's assertions," Pham, 317 F.3d at 182 (citation omitted), Salemo has not met the prejudice requirement to demonstrate that his counsel was ineffective in this respect.

2.    Fourth Amendment Claim

When a petitioner claims ineffective assistance of counsel on account of a defense attorney's failure to litigate a Fourth Amendment claim, he must prove both "that his Fourth Amendment claim is meritorious and that there is a reasonable probability that the verdict would have been different absent the excludable evidence."  Kimmelman v. Morrison, 477 U.S. 365, 375 (1986); accord United States v. Matos, 905 F.2d 30, 32 (2d Cir. 1990).  In considering whether a claim is "meritorious," we note that defense counsel are not required "routinely to file boilerplate motions merely to vindicate their professional competence without regard for the grounds supporting such motions."  United States v. DiTommaso, 817 F.2d 201, 215 (2d Cir.

1987).  Rather, they are required only to file those motions "having a solid foundation."  United States v. Nersesian, 824 F.2d 1294, 1322 (2d Cir. 1987).

Salemo argues that his counsel was ineffective because they refused to file a motion to suppress evidence allegedly obtained through an illegal search and seizure.  See Pet. at 9-10.  He identifies three such pieces of evidence: a copy of the fraudulent USDA grant signed by Williams, Gatto's bank statement, and a copy of one of the payroll checks that was altered and sent to Milbank.  See id.; Salemo Supp'l Reply at 2.  The petition's argument on this point, see Pet. at 11-28, amounts to an undifferentiated narrative of events occurring prior to his arrest and indictment.[12]  The narrative is difficult to follow but Salemo seems to claim that Dinkins inappropriately pushed for his prosecution; that she gained unauthorized entry to the GAIA office and obtained a box of materials, which she later returned; that she authorized or directed a GAIA employee to steal hard drives and other materials from the GAIA office; that Salemo did not receive a receipt for the materials Dinkins obtained from the GAIA office; that he was locked out of the GAIA office; that Dinkins appointed a GAIA employee named Troy Sargent as interim CEO of GAIA in Salemo's place; and that she and other law enforcement agents illegally entered Salemo's apartment and seized certain personal effects.  See id. at 11-28.  Many of these

_____

[12]  These allegations also formed the basis of a civil complaint Salemo filed against various government officials, including Dinkins.  See Complaint, Salemo v. Hastings, 11 Civ. 2525, filed Apr. 6, 2011 (Docket # 2); Motion for Reconsideration, Salemo v. Hastings, 11 Civ. 2525, filed Feb. 24, 2012 (Docket # 30).  That complaint was dismissed for failure to state a claim, with the court finding that the searches at issue were not unreasonable under the Fourth Amendment.  See Opinion, Salemo v. Hastings, 11 Civ. 2525, filed Sept. 27, 2012 (Docket # 40), at 12-14.  Portions of Salemo's habeas petition appear to cite documents filed in that case, see Motion for Reconsideration, Salemo v. Hastings, 11 Civ. 2525, filed Feb. 24, 2012 (Docket # 30), and indeed, several pages of the petition are virtually identical to pages contained in another filing in that case, compare Pet. at 11-27 with Motion by Plaintiff to Deny Government's Motion to Dismiss, Salemo v. Hastings, 11 Civ. 2525, filed July 29, 2013 (Docket # 53), at 3-19.

allegations are irrelevant to the instant petition.

Relevant to the instant petition, however, is Salemo's contention that Dinkins entered the offices of GAIA with Sargent in the evening of May 21, 2009, without a warrant, and seized a box of "materials, documents, financial documents, hard drives."  Id. at 16-17; see Salemo Supp'l Reply at 6.  Salemo alleges that Dinkins returned to the GAIA office with that same box the next day, see Pet. at 18, but a few days later, agents sent an individual named Keith Bauman into the GAIA office to "take additional hard drives" and "more documents," id. at 21; see id. at 26; Salemo Supp'l Reply at 8.  Salemo and the Government apparently agree that agents eventually obtained a search warrant to examine the materials contained in the box from the GAIA office, after the searches of the GAIA office were alleged to have occurred.  See Pet. at 13; Gov't Second Supp'l Resp. at 3; see also Dinkins: Tr. 595 (Dinkins's testimony that she obtained a search warrant for the box of materials from GAIA).  According to Salemo, each of the three pieces of evidence challenged here were illegally recovered from the GAIA offices. See Pet. at 9-10, 25; Salemo Supp'l Reply at 9.[13]  We address each piece of evidence in turn and conclude that a motion to suppress the challenged evidence would not have been meritorious,

_____

[13]  The record indicates that, if anything, the challenged evidence came from the box of materials obtained from the GAIA office during the initial search, rather than the subsequent search by Bauman.  See Affidavit in Support of a Search Warrant, dated June 5, 2009, annexed as Ex. B to Gov't Second Supp'l Reply, ¶ 5 (the box contained, inter alia, "payroll and bank records" and "binders maintained by GAIA . . . containing bank account information"); Email from Bethanne Dinkins, dated May 22, 2009, attached as Ex. 11 to Salemo Supp'l Reply (indicating that the box from the GAIA office included, inter alia, "payroll records" and "a different version of the fraudulent USDA Grant Agreement (where the GAIA representative name was changed from 'George Salemo' to 'Brandon Williams'")); Email from Beth Dinkins, dated Nov. 2, 2010, annexed as Ex. 130A to Salemo Supp'l Reply (Dinkins "instructed Baumwald [sic] to return the [additional] items he had taken" from the GAIA office).  Moreover, Salemo's petition and supplemental submissions focus almost entirely on that initial search.  We therefore do not find it necessary to consider the admissibility of any other materials which may have been allegedly obtained through Bauman.

and therefore Salemo's counsel was not ineffective for failing to make such a motion.  See

Maldonado v. Burge, 697 F. Supp. 2d 516, 525 (S.D.N.Y. 2010) ("[C]ounsel's failure to make a

suppression motion that is obviously non-meritorious cannot be said to constitute deficient

performance.") (citation omitted).  In addition, we conclude that no prejudice resulted from the

failure to make any motion to suppress.

a.   Deficient Performance

i.  The Copy of the Fraudulent USDA Grant Signed by Brandon Williams.  The first

piece of evidence Salemo contends his counsel should have moved to suppress was a copy of the

fraudulent USDA grant signed by GAIA's COO, Brandon Williams.  See Pet. at 9.  The

Government maintains that this document was provided by Porsch, Gov't Supp'l Resp. at 1, but

Salemo contends that it was "obtained from employees during the illegal search of [the] GAIA

office," Pet. at 10 (capitalization and citation omitted).  Salemo cites to no evidence to support

this statement other than Dinkins's trial testimony.  But Dinkins testified that she received

"approximately six copies" of the document from several GAIA employees "[d]uring the course

of the investigation" of Salemo.  (Dinkins: Tr. 566-67).  In other words, Dinkins's testimony

indicates that the Government obtained the challenged document through third parties, and not

from the box of evidence from the GAIA office.  This is corroborated by Porsch's own

testimony, which indicates that he received an email from Salemo attaching a copy of the grant

purportedly bearing Williams's signature as well as Mikkelsen's.  (See Porsch: Tr. 60-61, 65-

66).

It is well established that "a person has no legitimate expectation of privacy in

information he voluntarily turns over to third parties."  Smith v. Maryland, 442 U.S. 735, 743-44

(1979) (citations omitted).  Accordingly, the Fourth Amendment does not prohibit the

Government from obtaining information from a third party which the defendant voluntarily

disclosed to the third party.  See id. at 744.  Here, the testimony shows that Salemo voluntarily

disclosed the fraudulent grant bearing Williams's signature to Porsch by emailing it to him and

that Porsch provided that grant to Dinkins.  (See Dinkins: Tr. 566; Porsch: Tr. 60-61, 65-66).

Given this, and considering that Salemo's assertion that Dinkins obtained the grant from a search

of the GAIA office is entirely unsupported by evidence in the record, Salemo's counsel could

reasonably have decided that he did not have a basis for challenging the admissibility of this

grant.

   Moreover, even if this copy of the fraudulent grant had been obtained from the box of

materials from the GAIA office rather than from Porsch, the record does not provide a basis for

finding that the search of the GAIA office was illegal.  Salemo contends that Dinkins went with

GAIA employee Sargent to search the GAIA offices on May 21, 2009, and that security tape

footage exists which will corroborate this assertion.  See Pet. at 16-17; Salemo Supp'l Reply at

6.  But no such tapes are part of the record.  Moreover, Salemo himself offers evidence — in the

form of emails sent by Dinkins — that contradicts his assertion.  These emails recount that on

May 21, 2009, Dinkins received a phone call from a "disgruntled" GAIA employee who wanted

to turn over "several shopping bags of 'evidence'" to Dinkins, and that the employee was

concerned that the evidence "might be destroyed by Salemo if it is left in the office overnight."

Email from Bethanne Marik-Dinkins, dated May 21, 2009, attached as Ex. 8 to Salemo Supp'l

Reply; see Email from Beth Dinkins, dated Nov. 2, 2010, attached as Ex. 130A to Salemo Supp'l

Reply.  Thus, counsel might have reasonably chosen not to make a motion to suppress this

evidence given the lack of evidence that Dinkins improperly took or directed GAIA employees to deliver the materials to her.

ii. Gatto's Bank Statement.  As to the second challenged piece of evidence, Dinkins testified that she obtained the copy of Gatto's bank statement from a briefcase belonging to Salemo, which was seized incident to his arrest.  (Dinkins: Tr. 590).  An exception to the Fourth Amendment's warrant requirement exists for a search incident to a lawful arrest.  E.g., Arizona v. Gant, 556 U.S. 332, 338 (2009) (citing Weeks v. United States, 232 U.S. 383, 392 (1914)).  "[A] search incident to arrest may only include 'the arrestee's person and the area within his immediate control,'" meaning "the area from within which he might gain possession of a weapon or destructible evidence."  Id. at 339 (quoting Chimel v. California, 395 U.S. 752, 763 (1969)).  Additionally, the Supreme Court has held that it is "not 'unreasonable' for police, as part of the routine procedure incident to incarcerating an arrested person, to search any container or article in his possession, in accordance with established inventory procedures."  Illinois v. Lafayette, 462 U.S. 640, 648 (1983) (footnote omitted).

The record is not clear whether agents searched the briefcase at the time of Salemo's arrest or later, as part of an inventory procedure.  In any event, Salemo does not challenge the seizure of the briefcase incident to his arrest or the search thereof, except to say that no inventory of his briefcase's contents was made at the time of his arrest.  See Pet. at 10; Salemo Supp'l Reply at 11.  Instead, he claims that the bank statement was not in his briefcase, but on his desk at the GAIA office.  See Pet. at 10; Salemo Supp'l Reply at 9.  Apparently, his contention is that Dinkins took the bank statement from Salemo's desk when she entered the GAIA offices with Sargent on May 21, 2009, and later lied that it had been in the briefcase.  See Pet. at 10; Salemo

Supp'l Reply at 9-10.  But Salemo offers no evidence in support of this claim.  He states that Dinkins testified that she did not recall how she had obtained the bank statement, see Pet. at 10, but a review of the cited portion of Dinkins's testimony reveals that she stated that she did not recall how she obtained a series of emails from GAIA, not the bank statement (see Dinkins: Tr. 611).  With respect to the bank statement, Dinkins clearly testified that the statement was found "in a briefcase belonging to George Salemo, which was seized incident to arrest."  (Dinkins: Tr. 590)  Given Dinkins' contention, Salemo's counsel could have reasonably decided that a motion to suppress this piece of evidence would not have been successful.

   iii.  The Payroll Check that Was Altered and Sent to Milbank.  With respect to the third piece of evidence that Salemo challenges — "the check (American Reclaimed Properties) made out to Williams where the check number was alleged to have been changed and then given/faxed to Milbank," Pet. at 9-10 (capitalization omitted) — Salemo has clarified, see Salemo Supp'l Reply at 2, that he means to challenge the original payroll check made out to Williams, which agents obtained "during a search warrant . . . [o]f a box of materials obtained from [GAIA]" (Dinkins: Tr. 596).  At trial, the Government's theory with respect to this evidence was that Salemo took previously deposited checks, like the challenged payroll check made out to Williams, altered them, and then sent copies to Milbank.  See Tr. 684-85 (Government summation).  The original payroll check was admitted into evidence without objection (Tr. 596), separate from the altered version sent to Milbank, which was also admitted without objection (Yashouafar: Tr. 422-23); GX 405.  On direct examination, the Government asked Dinkins to compare these two checks.  (See Dinkins: Tr. 603-05).

   The Government acknowledges that this last piece of evidence was in the box of

38

materials obtained from the GAIA office.  See Gov't Second Supp'l Resp. at 2-4; see also

Dinkins: Tr. 596 (Dinkins testimony that the payroll check came from a box of materials from

GAIA); Tr: 598-600 (sidebar discussion during which counsel for the Government indicated that

Dinkins obtained the check from a box provided by a GAIA employee).  As discussed above,

however, we cannot find that the initial search of the GAIA offices and seizure of the box of

materials was illegal.  Therefore, Salemo's counsel was not ineffective for failing to make a

motion to suppress the payroll check.

b.    <u>Prejudice</u>

Aside from his failure to establish that counsel should have moved to suppress the

materials he cites, Salemo offers nothing by way of showing a "reasonable probability that the

verdict would have been different" had the evidence been suppressed, Matos, 905 F.2d at 32

(citation and internal quotation marks omitted).  We reach this conclusion in light of the

overwhelming evidence offered by the Government at trial in the form of witness testimony,

email communications, and copies of various forged and altered documents received by third

parties.  Cf. Strickland, 466 U.S. at 696 ("[A] verdict or conclusion only weakly supported by

the record is more likely to have been affected by errors than one with overwhelming record

support."); see also, e.g., Mattie v. Fisher, 2009 WL 3762301, at *5 (E.D.N.Y. Nov. 10, 2009)

("In light of the substantial evidence of [petitioner's] guilt presented at trial, including the

testimony of two eyewitnesses, the use of several false exculpatory statements given to the

police does not undermine the outcome of the proceedings.").

With respect to the forged grant signed by Williams, the Government introduced multiple

copies of the grant bearing the purported signatures of Mikkelsen and Salemo.  (See, e.g., Tr. 41-

39

54; 76).  It also introduced testimony from Mikkelsen indicating that the grants were indeed

forged (see Mikkelsen: Tr. 39-42, 45-52); testimony from three different witnesses that Salemo

had requested loans based on the grant (see Porsch: Tr. 59-67; Lucangeli: Tr. 73-74; Knee: Tr.

487, 490, 497); testimony showing that Salemo attempted to convince Lucangeli that the grant

was genuine (see Lucangeli: Tr. 88-93); and evidence that the forged grant stated that any funds

received were to be directed to a GAIA-held bank account (see Dinkins: Tr. 569-70).  The forged

grant signed by Williams was thus of little importance given the other evidence that was

introduced.

   With respect to Gatto's bank statement and the copy of one of the payroll checks that was

ultimately altered and sent to Milbank, the Government introduced testimony regarding a "proof

of funds" Salemo directed Corrado to email to Milbank, which was missing an account number,

had inconsistent fonts, did not contain the name of the bank, and was missing a word (see

Corrado: Tr. 212-15); testimony that, in connection with the Milbank transaction, Salemo wrote

a check for $5,000,000 from an account that he knew only had a balance of $10,000 to $12,000

(see Corrado: Tr. 256-57, 261); evidence of checks received by Milbank that had apparent flaws

on their face but which Salemo insisted were "good" or "ok" (see Yashouafar: Tr. 419-20, 422-

24, 426-27; GX 404, GX 405; see also Radparvar: Tr. 523, 525-26, 614-16); GX 404; GX 405;

and testimony that Salemo used the alias Gerald Meyers in connection with some dealings with

Milbank (see, e.g., Radparvar: Tr. 510-12).  In light of this evidence, Gatto's bank statement and

the payroll check were of no particular importance.  Also, given that Salemo has made no

particularized argument as to the "reasonable probability" that the verdict would have been

different on either count if the challenged evidence had been suppressed, Salemo has not

established the prejudice prong of his Fourth Amendment-based ineffective assistance of counsel claim.

      3.    <u>Sentencing</u>

         a.    <u>Reasonableness</u>

Salemo claims that his attorneys were ineffective at his sentencing because they "[said] nothing at sentencing but [stood] on their sentencing memorandum." Pet. at 8-9. Here, too, Salemo has not shown that his counsel's actions fell below an objective standard of reasonableness. Salemo's counsel submitted a pre-sentencing letter that made several arguments: that Salemo's Offense Level should be reduced, that his Criminal History Category should be reduced, and that he should receive a shorter sentence because of his age and ill health. <u>See</u> Def. Sent. Ltr. at 2-3, 5-6. Salemo's argument centers around the fact that his counsel opted to rely on this letter at the sentencing hearing, rather than making an oral presentation, but the pre-sentencing letter fully addressed the alleged errors in the PSR at length, <u>see id.</u> at 2-3, 5, and we do not see why defense counsel must repeat orally the arguments made in a written sentencing submission in order to be effective. Moreover, the Court's sentencing determination shows that it in fact considered the arguments made in defense counsel's pre-sentencing letter (<u>see</u> Sent. Tr. 4 ("The biggest disagreement seems to be over the amount of the intended loss."); Sent. Tr. 5 (the other issue was "whether the criminal history is overstated because the prior convictions, except for the recent one for writing a bad check, are quite old")), although it ultimately concluded that Salemo should receive "a very severe sentence" (Sent. Tr. 10).

Salemo also contends that his counsel failed to "object to the misstatement, errors of the PSR." Pet. at 51. Without further explanation — which Salemo does not provide — we are

unable to determine what alleged errors this statement refers to.  However, we note that

Salemo's counsel objected to the description of the offense conduct contained in the PSR and

argued that one of the sentences for a prior conviction listed in the PSR was misstated at

sentencing.  (See Sent. Tr. at 2-3).

For these reasons, we find that Salemo has not shown that his counsel's representation at

his sentencing fell below the standard of objective reasonableness.

b.      Prejudice

Salemo does not identify with any specificity what arguments he would have had his

counsel make at his sentencing, or what would have been gained by his counsel making an oral

argument in addition to the pre-sentencing letter.  Indeed, he makes no allegations whatsoever as

to how he was prejudiced by his counsel's decision to rely on their pre-sentencing letter, let

alone presenting any "objective evidence" establishing prejudice.  Pham, 317 F.3d at 182.  For

this reason as well, we reject Salemo's claim of ineffective assistance with respect to his

counsel's conduct at his sentencing.

IV.   CONCLUSION

For the foregoing reasons, Salemo's petition to vacate, set aside, or correct his sentence

should be denied.

**PROCEDURE FOR FILING OBJECTIONS TO THIS
REPORT AND RECOMMENDATION**

Pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), the parties have fourteen

(14) days including weekends and holidays from service of this Report and Recommendation to

serve and file any objections.  See also Fed. R. Civ. P. 6(a), (b), (d).  Such objections (and any

responses to objections) shall be filed with the Clerk of the Court, with copies sent to the Hon.

Jed S. Rakoff at 500 Pearl Street, New York, New York 10007. Any request for an extension of time to file objections must be directed to Judge Rakoff. If a party fails to file timely objections, that party will not be permitted to raise any objections to this Report and Recommendation on appeal. See Thomas v. An, 474 U.S. 140 (1985); Wagner & Wagner, LLP v. Atkinson, Hawkins, Nellie, Britt Ingham, Glad & Carwile, P.C., 596 F.3d 84, 92 (2d Cir. 2010).

Dated: May 17, 2016
      New York, New York

GABRIEL W. GORENSTEIN
United States Magistrate Judge

Copy sent to:

George Paul Salemo
22891-008
Federal Prison Camp
P.O. Box 420
Fairton, NJ 08320

43